# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

TOMRA OF NORTH AMERICA, INC v DEPARTMENT OF TREASURY

Docket Nos. 158333 and 158335. Argued November 7, 2019 (Calendar No. 3). Decided June 16, 2020.

TOMRA of North America, Inc., brought two separate actions in the Court of Claims against the Department of Treasury, seeking a refund for use tax and sales tax that plaintiff had paid on the basis that plaintiff's sales of container-recycling machines and repair parts were exempt from taxation under the General Sales Tax Act (GSTA), MCL 205.51 *et seq*., and the Use Tax Act (UTA), MCL 205.91 *et seq*. Plaintiff moved for summary disposition, seeking a ruling on the question whether plaintiff's container-recycling machines and repair parts perform, or are used in, an industrial-processing activity under the GSTA and UTA. The Court of Claims, MICHAEL J. TALBOT, J., denied plaintiff's motion and instead granted summary disposition in favor of defendant, holding that plaintiff's container-recycling machines and repair parts were not used in an industrial-processing activity and that plaintiff therefore was not entitled to exemption from sales and use tax for the sale and lease of the machines and their repair parts. The Court of Claims found that the tasks that plaintiff's machines performed occurred before the industrial process began, reasoning that the activities listed in MCL 205.54t(3) and MCL 205.94o(3) are only industrial-processing activities when they occur between the start and end of the industrial process as defined by MCL 205.54t(7)(a) and MCL 205.94o(7)(a), respectively. Plaintiff appealed, and the Court of Appeals consolidated the appeals. The Court of Appeals, GADOLA, P.J., and RIORDAN, J. (K. F. KELLY, J., dissenting), reversed, declining to interpret MCL 205.54t(7)(a) and MCL 205.94o(7)(a) as placing a temporal limitation on the activities listed in MCL 205.54t(3) and MCL 205.94o(3), respectively. 325 Mich App 289 (2018). Defendant sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 503 Mich 987 (2019).

In a unanimous opinion by Justice VIVIANO, the Supreme Court *held*:

Plaintiff's sales of container-recycling machines and repair parts were exempt from taxation under the industrial-processing exemption because the temporal limitation specified in the general statutory definition of industrial processing under MCL 205.54t(7)(a) of the GSTA and MCL 205.94o(7)(a) of the UTA did not apply to the enumerated list of industrial-processing activities in MCL 205.54t(3) and MCL 205.94o(3), respectively; the rule of strict construction of tax exemptions was inapplicable in this case because the statutes were unambiguous.

1. There is a canon of construction that tax exemptions must be strictly construed in favor of the government, i.e., against the finding of an exemption. The preference against tax exemptions is a judicially created substantive canon, meaning that it is premised on certain policies or political objectives instead of its usefulness in uncovering a statute's ordinary meaning. Because the canon requiring strict construction of tax exemptions does not help reveal the semantic content of a statute, it is a canon of last resort. That is, courts should employ it only when an act's language, after analysis and subjection to the ordinary rules of interpretation, presents ambiguity. In this case, the canon was inapplicable because the statutes were unambiguous: their ordinary meaning was discernible by reading the text in its immediate context and with the aid of appropriate canons of construction.

2. The GSTA imposes taxes on the sale of goods, and the UTA imposes taxes on goods purchased outside the state for use in the state. To avoid the double taxation of a product that would result from exacting both use and sales taxes, the Legislature exempted certain property used or consumed in industrial processing from the taxes in each act. Pursuant to MCL 205.54t(1)(b) and (c) of the GSTA and MCL 205.94o(1)(b) and (c) of the UTA, the exemption covers, among other things, tangible personal property that is intended for ultimate use in and is used in industrial processing by an industrial processor or is used by a person, whether or not an industrial processor, to perform an industrial-processing activity for or on behalf of an industrial processor. The industrial-processing exemption provides both a general definition of industrial processing, MCL 205.54t(7)(a); MCL 205.94o(7)(a), and also a list of specific activities that constitute industrial-processing activities, MCL 205.54t(3); MCL 205.94o(3). Subsection (7)(a) generally defines industrial processing as the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail. Subsection (7)(a) further provides that industrial processing begins when tangible personal property begins movement from raw-materials storage to begin industrial processing and ends when finished goods first come to rest in finished-goods-inventory storage. The second sentence of Subsection (7)(a) thus establishes a temporal period during which industrial processing must occur, spanning from when property begins movement from raw-materials storage into processing until the finished goods enter inventory storage. Subsection (3) states that industrial processing includes 11 enumerated activities. In this case, plaintiff's machines facilitated the collection of raw materials outside the time frame described in Subsection (7)(a). However, *Detroit Edison Co v Dep't of Treasury*, 498 Mich 28 (2015), explained that Subsection (7)(a) and Subsection (3) are discrete inquiries—Subsection (7)(a) does not establish a threshold requirement for an exemption as long as Subsection (3) applies. Some of the activities listed in Subsection (3) fall outside the period specified in the general definition but are still considered industrial-processing activities. Extending the temporal limitation in Subsection (7)(a) to all requests for exemptions would leave portions of Subsection (3) without meaning or function within the statute. Instead, interpreting Subsection (3) as the more specific provision resolves the conflict and accords the statutes their most natural and ordinary meanings. Therefore, the Court of Appeals correctly held that the temporal limitation in Subsection (7)(a) does not apply to the industrial-processing activities listed in Subsection (3).

Affirmed and remanded to the Court of Claims for further proceedings.

©2020 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED June 16, 2020

STATE OF MICHIGAN

SUPREME COURT

TOMRA OF NORTH AMERICA, INC.,

Plaintiff-Appellee,

v

Nos. 158333 and
158335

DEPARTMENT OF TREASURY,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

At issue is whether plaintiff TOMRA of North America, Inc.'s container-recycling machines and repair parts are excluded as a matter of law from qualifying for the industrial-processing-activity exemptions under MCL 205.54t of the General Sales Tax Act (GSTA), MCL 205.51 et seq., and MCL 205.94o of the Use Tax Act (UTA), MCL 205.91 et seq. Specifically, we must determine whether the temporal limitation specified in the general statutory definition of "industrial processing," MCL 205.54t(7)(a); MCL 205.94o(7)(a),

applies to the enumerated list of "industrial processing" activities in MCL 205.54t(3) and MCL 205.94o(3), respectively. To answer this question, we first clarify that because the statutes are unambiguous, the interpretive principle that tax exemptions are strictly construed is inapplicable to this case. Under the proper interpretive standards, we hold that the temporal limitation in MCL 205.54t(7)(a) and MCL 205.94o(7)(a) does not apply to the activities listed in MCL 205.54t(3) and MCL 205.94o(3), respectively.

## I. FACTS AND PROCEDURAL HISTORY

TOMRA sells and leases reverse-vending machines, the bottle- and can-recycling machines commonly found in grocery stores used to help retailers comply with Michigan's bottle-deposit law, MCL 445.571 *et seq*. The company also sells repair parts for the machines. The machines sort the bottles and cans, which are then placed in bins and brought to a recycling facility. The facility then sells the bottles and cans to manufacturers who use the materials in other products.

TOMRA claimed that its machines were exempt from both the GSTA and the UTA under each act's industrial-processing exemption.[1] After an audit by defendant, the Department of Treasury, TOMRA sought a determination from the Court of Claims that its machines fall within the industrial-processing exemptions. In granting summary disposition to the department, the Court of Claims found that the tasks that TOMRA's machines perform occur before the industrial process begins; therefore, TOMRA could not avail itself of the industrial-processing exemptions. The Court of Claims reasoned that the activities listed in MCL 205.54t(3) (establishing that industrial processing includes 11

_____

[1] See MCL 205.54t; MCL 205.94o.

2

enumerated activities) and MCL 205.94o(3) (same) are only industrial-processing activities when they occur between the start and end of the industrial process as defined by MCL 205.54t(7)(a) and MCL 205.94o(7)(a), respectively.

The Court of Appeals, in a split, published decision, reversed the Court of Claims, declining to interpret MCL 205.54t(7)(a) and MCL 205.94o(7)(a) as placing a temporal requirement on the activities listed in MCL 205.54t(3) and MCL 205.94o(3), respectively.[2] The Court explained, "The statute does not state that industrial processing *must* begin this way but rather states that when tangible personal property begins movement from raw-materials storage to begin industrial processing, one can rest assured that industrial processing has begun."[3] The Court held that MCL 205.54t and MCL 205.94o do not preclude industrial processing from "occur[ring] without the initial step of moving raw materials from storage, or when tangible items are never in raw-materials storage," and reversed and remanded.[4] Judge K. F. KELLY dissented, arguing that the temporal limitation applied to the activities listed in MCL 205.54t(3) and MCL 205.94o(3).[5]

---

[2] *TOMRA of North America, Inc v Dep't of Treasury*, 325 Mich App 289, 301; 926 NW2d 259 (2018).

[3] *Id.*

[4] *Id.* at 302-303.

[5] *Id.* at 304 (K. F. KELLY, J., dissenting).

## II.  STANDARD OF REVIEW

"We review de novo a trial court's determination regarding a motion for summary disposition.  Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law."[6]

## III.  ANALYSIS

## A.  INTERPRETIVE STANDARDS

Before addressing the question presented in this case, we first take this opportunity to clarify the interpretive standards applicable to statutory tax exemptions.  In every case requiring statutory interpretation, we seek to discern the ordinary meaning of the language in the context of the statute as a whole.[7]  But with regard to tax exemptions, the oft-repeated rule is that they must be strictly construed in favor of the government, i.e., against the finding of an exemption.[8]  Stated more fully, this canon of construction provides that " '[a]n intention on the part of the legislature to grant an exemption from the taxing power of the State will never be implied from language which will admit of any other reasonable construction.  Such an intention must be expressed in clear and unmistakable terms, or must appear by necessary implication from the language used . . . .' "[9]  The Court of

---

[6] *Clam Lake Twp v Dep't of Licensing & Regulatory Affairs*, 500 Mich 362, 372; 902 NW2d 293 (2017) (quotation marks and citations omitted).

[7] *Ally Fin Inc v State Treasurer*, 502 Mich 484, 493; 918 NW2d 662 (2018).

[8] See, e.g., *Evanston YMCA Camp v State Tax Comm*, 369 Mich 1, 7; 118 NW2d 818 (1962).

[9] *Detroit v Detroit Commercial College*, 322 Mich 142, 148-149; 33 NW2d 737 (1948), quoting 2 Cooley, Taxation (4th ed), § 672, p 1403.

Appeals below referred to this commonly recited principle, and the department invokes it in this Court.[10]  We therefore must determine, at the outset, the canon's proper function.

The preference against tax exemptions is a judicially created substantive canon, meaning that it is premised on certain policies or political objectives instead of its usefulness in uncovering a statute's ordinary meaning.[11]  In other words, it loads the dice in favor of one interpretation, not because that interpretation is more likely to be semantically correct but because it better serves policy objectives.  The justification for the canon has long been tied to political theory.  When it first appeared in our caselaw in 1854, the Court explained that tax exemptions were "construed strictly" because they were "in derogation of equal rights."[12]  "Equal rights" referred to the Jacksonian-era political doctrine—which found its way into the law in various capacities—that legislation favoring

---

[10] *TOMRA*, 325 Mich App at 296.

[11] See generally Slocum, *Ordinary Meaning: A Theory of the Most Fundamental Principle of Legal Interpretation* (Chicago: University of Chicago Press, 2015), p 174 ("[S]ubstantive canons are judge created and represent a wide range of concerns that are relevant to the law" and that "are not tied to particular linguistic phenomena . . . ."); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 362 ("But almost always, the only announced justification for the rule [of narrow construction] is to the effect that it is necessary to achieve the beneficial purposes of the law."); Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U Chi L Rev 800, 807 (1983) ("But I know of no neutral, nonpolitical basis on which a judge can decide whether the legislature should be forced by some version of strict construction to legislate less . . . .").

[12] *Detroit Young Men's Society v Detroit*, 3 Mich 172, 179 (1854).  Earlier cases touched on the issue but did not make such a clear interpretive pronouncement.  See *Lefevre v Detroit*, 2 Mich 586, 591 (1853) (noting, among other things, that the Legislature's inclusion of certain exempt properties suggested the exclusion of others); *People v Detroit & P R*, 1 Mich 458, 460 (1850) (noting that because the company's charter was silent regarding taxation, there was no exemption).

one class or group should be limited, if allowed at all.[13] This rationale, in the context of

taxes, has continued to buttress the canon in our cases.[14] The canon does not, then, shed

---

[13] See *Green v Graves*, 1 Doug 351, 366-367 (Mich, 1844) (discussing "the doctrine of equal rights and equal privileges, so much cherished by the people," that militated against monopoly power or privilege); see also Gillman, *The Constitution Besieged: The Rise and Demise of Lochner Era Police Powers Jurisprudence* (Durham: Duke University Press, 1993), p 7 (discussing the "Jacksonian ethos that emphasized equal rights and the dangers of legislating special privileges for particular groups and classes" instead of equal laws for the general public); Binney, *Restrictions Upon Local and Special Legislation in State Constitutions* (Philadelphia: Kay & Brother, 1894), p 6 (discussing the "very general feeling of hostility to all local and special legislation" benefiting particular groups or areas and the legal restrictions that developed to stem this legislation); Cooley, Constitutional Limitations (5th ed), pp 486-487 ("Equality of rights, privileges, and capacities unquestionably should be the aim of the law; and if special privileges are granted, or special burdens or restrictions imposed in any case, it must be presumed that the legislature designed to depart as little as possible from this fundamental maxim of government. . . . Special privileges are always obnoxious, and discriminations against persons or classes are still more so; and, as a rule of construction, it is to be presumed they were probably not contemplated or designed."); Rosen, *Class Legislation, Public Choice, and the Structural Constitution*, 21 Harv J L & Pub Pol'y 181, 182-183 (1997) ("Jacksonian judges and treatise writers pointed to state due process, equal protection, and special legislation clauses to argue that states were not free to pass 'special' laws, or 'class legislation,' but had to legislate in the 'public interest,' or 'for the purpose of benefiting the polity as a whole.' ") (citation omitted); Schlesinger, Jr, *The Age of Jackson* (Boston: Little, Brown & Co, 1945), p 316 ("The [Jacksonian] prescription of free enterprise thus became government action to destroy the 'blighting influence of partial legislation, monopolies, congregated wealth, and interested combinations' in the interests of the 'natural order of society.' ") (citation omitted); White, *Foreword* to Leggett, *Democratick Editorials: Essays in Jacksonian Political Economy* (Indianapolis: Liberty Fund, 1984), pp xvii-xviii ("The equal rights principle meant . . . that the law may not discriminate among citizens, benefiting some at the expense of others. Few government programs could pass through this filter. Strict application of the equal rights principle thus led [its proponents] naturally to favor minimization of government powers. Every extension of the sphere of government action beyond the Jeffersonian night-watchman duties . . . created a privileged aristocratic class at the expense of the productive laboring class.").

[14] See, e.g., *Wexford Med Group v City of Cadillac*, 474 Mich 192, 204; 713 NW2d 734 (2006) ("[B]ecause tax exemptions upset the desirable balance achieved by equal taxation, they must be narrowly construed."); *Retirement Homes of Detroit Annual Conference of*

any light on whether the ordinary language of a statute enacted by the Legislature provides a tax exemption. Perhaps for this reason, our caselaw—especially in recent opinions—has also stressed that the canon cannot overcome the plain text, and in a few cases, we have not relied on or mentioned it at all.[15]

*United Methodist Church, Inc v Sylvan Twp*, 416 Mich 340, 348; 330 NW2d 682 (1982) ("A property tax exemption is in derogation of the principle that all property shall bear a proportionate share of the tax burden and, consequently, a tax exemption will be strictly construed."); *In re Smith Estate*, 343 Mich 291, 297; 72 NW2d 287 (1955) ("[O]ur point of departure in the interpretation of any taxing act is the consideration that a preference in or an exemption from taxation must be clearly defined and without ambiguity. Taxation, like rain, falls on all alike. True, there are, in any taxing act, certain exceptions, certain favored classes, who escape the yoke. But one claiming the unique and favored position must establish his right thereto beyond doubt or cavil."); cf. *East Saginaw Mfg Co v East Saginaw*, 19 Mich 259, 277-280 (1869) (finding no exemption and noting the danger that various classes, such as railroads or manufacturers, could seek perpetual exemptions from taxation and that strict construction was justified because a state should not lightly be taken to have given away its power to tax); 3A Singer, Sutherland Statutes and Statutory Construction (8th ed, April 2020 update), § 66:9 ("This rule of strict construction derives from the same rationale supporting strict construction of positive revenue laws, that the burdens of taxation should be distributed equally and fairly among members of society.").

[15] See, e.g., *Ally Fin Inc*, 502 Mich at 491-492 (noting the canon but observing that "we have also explained 'that this requirement does not permit a "strained construction" that is contrary to the Legislature's intent' "), quoting *SBC Health Midwest, Inc v City of Kentwood*, 500 Mich 65, 71; 894 NW2d 535 (2017), in turn quoting *Mich United Conservation Clubs v Lansing Twp*, 423 Mich 661, 664-665; 378 NW2d 737 (1985); *Gardner v Dep't of Treasury*, 498 Mich 1; 869 NW2d 199 (2015) (interpreting a tax exemption without mention of strict construction); *Stone v Michigan*, 467 Mich 288; 651 NW2d 64 (2002) (same); *Mich United Conservation Clubs*, 423 Mich at 665 ("However, this rule [of strict construction] does not mean that we should give a strained construction which is adverse to the Legislature's intent."), citing *City of Ann Arbor v Univ Cellar, Inc*, 401 Mich 279, 288-289; 258 NW2d 1 (1977); *Webb Academy v Grand Rapids*, 209 Mich 523, 536; 177 NW 290 (1920) (noting the canon but stating that it could not "be extended so far as to defeat the legislative intent") (quotation marks and citation omitted); *Detroit Home & Day Sch v Detroit*, 76 Mich 521, 525; 43 NW 593 (1889) ("Where language is so plain as to convey a clear and intelligible meaning, we have no right to go beyond it, and impose another meaning. The language of the Legislature in exemption from taxation is as much entitled to obedience as that imposing taxation."); *Schaub v Seyler*, 504 Mich 987,

7

We take this opportunity to clarify that because the canon requiring strict construction of tax exemptions does not help reveal the semantic content of a statute, it is a canon of last resort. That is, courts should employ it only "when an act's language, after analysis and subjection to the ordinary rules of interpretation, presents ambiguity."[16] In the present case, the canon is inapplicable because, as we explain below, the statutes are unambiguous: their ordinary meaning is discernible by reading the text in its immediate context and with the aid of appropriate canons of interpretation.[17]

## B. THE EXEMPTION

The GSTA imposes taxes on the sale of goods, and the UTA imposes taxes on goods purchased outside the state for use in the state.[18] To avoid the double taxation of a product

---

991 (2019) (VIVIANO, J., concurring) (noting that strict-construction rules represent "a method of interpretation that has largely fallen out of favor").

[16] Singer, § 66:9; see also *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014) ("When a statute's language is unambiguous, 'the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted.' ") (citation omitted).

[17] See *Mayor of Lansing v Pub Serv Comm*, 470 Mich 154, 164-166; 680 NW2d 840 (2004) (noting that ambiguity can occur if a statutory provision " 'irreconcilably conflict[s]' with another provision" but that "a finding of ambiguity is to be reached only after 'all other conventional means of [] interpretation' have been applied and found wanting") (citations omitted; alterations in original).

[18] MCL 205.52(1) (providing, in pertinent part, that "there is levied upon and there shall be collected from all persons engaged in the business of making sales at retail, by which ownership of tangible personal property is transferred for consideration, an annual tax for the privilege of engaging in that business"); MCL 205.93(1) (providing, in pertinent part, a tax "for the privilege of using, storing, or consuming tangible personal property" that applies "to a person who acquires tangible personal property or services that are subject to the tax levied under this act . . . who subsequently converts the tangible personal property or service to a taxable use").

that would result from exacting both use and sales taxes, the Legislature exempted certain property used or consumed in industrial processing from the taxes in each act.[19]  The exemption covers, among other things, "tangible personal property [that] is intended for ultimate use in and is used in industrial processing by an industrial processor" or "is used by [a] person [whether or not an industrial processor] to perform an industrial processing activity for or on behalf of an industrial processor."[20]

The GSTA's industrial-processing exemption—which is, for present purposes, identical to the UTA's exemption and will be quoted in the text going forward—provides both a general definition of industrial processing, MCL 205.54t(7)(a), and also a list of specific activities that constitute industrial-processing activities, MCL 205.54t(3).[21]  The general definition in Subsection (7)(a) states:

> "Industrial processing" means the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage.[22]

---

[19] MCL 205.54t; MCL 205.94o.

[20] MCL 205.54t(1)(b) and (c); MCL 205.94o(1)(b) and (c).

[21] The parallel provisions in the UTA are located at MCL 205.94o(7)(a) and MCL 205.94o(3), respectively.

[22] MCL 205.54t(7)(a).  The UTA states:

> "Industrial processing" means the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail or

The definition's second sentence establishes a temporal period during which industrial processing must occur, spanning from when the property begins movement from raw-materials storage into processing until the finished goods enter inventory storage. Subsection (3) states:

> Industrial processing includes the following activities:
>
> (a) Production or assembly.
>
> (b) Research or experimental activities.
>
> (c) Engineering related to industrial processing.
>
> (d) Inspection, quality control, or testing to determine whether particular units of materials or products or processes conform to specified parameters at any time before materials or products first come to rest in finished goods inventory storage.
>
> (e) Planning, scheduling, supervision, or control of production or other exempt activities.
>
> (f) Design, construction, or maintenance of production or other exempt machinery, equipment, and tooling.
>
> (g) Remanufacturing.
>
> (h) Processing of production scrap and waste up to the point it is stored for removal from the plant of origin.
>
> (i) Recycling of used materials for ultimate sale at retail or reuse.
>
> (j) Production material handling.

---

affixed to and made a structural part of real estate located in another state. Industrial processing begins when tangible personal property begins movement from raw materials storage to begin industrial processing and ends when finished goods first come to rest in finished goods inventory storage. [MCL 205.94o(7)(a).]

(k) Storage of in-process materials.[23]

Machines and other equipment "used in an industrial processing activity and in their repair and maintenance" are eligible for the exemption, as are other types of property.[24]

The question in this case is whether TOMRA's container-recycling machines and repair parts qualify for the exemption under Subsection (3) even if they would not otherwise meet the temporal limitation in the general definition under Subsection (7)(a). The question arises because, as the Court of Appeals dissent noted, TOMRA's machines here "simply facilitate the collection of raw materials" outside the time frame described in Subsection (7)(a), i.e., the period beginning when the materials begin to move from raw-materials storage and ending when the finished goods are first stored as inventory.[25] Thus, if Subsection (7)(a) lays down a mandatory requirement, then TOMRA would not be entitled to an exemption even if it was engaged in one of the industrial-processing activities expressly set forth in Subsection (3).

We have never before addressed this issue, but general guidance can be found in *Detroit Edison Co v Dep't of Treasury*.[26] In deciding whether the exemption applied to equipment used in transmitting electricity, we suggested that a taxpayer could claim an exemption either by satisfying the general definition of industrial processing in Subsection (7)(a) or by showing that it was engaged in one or more of the enumerated activities listed

---

[23] MCL 205.54t(3); see also MCL 205.94o(3).

[24] MCL 205.54t(4)(b); see also MCL 205.94o(4)(b).

[25] *TOMRA*, 325 Mich App at 305 (K. F. KELLY, J., dissenting).

[26] *Detroit Edison Co v Dep't of Treasury*, 498 Mich 28; 869 NW2d 810 (2015).

11

in Subsection (3). Most directly, we stated that "the statute also provides that certain specific activities that do not satisfy the general MCL 205.94o(7)(a) definition nonetheless constitute 'industrial processing' activity for purposes of the statute," such as the activity described in MCL 205.94o(3)(h).[27] In other words, we made it clear that Subsection (7)(a) and Subsection (3) are discrete inquiries—Subsection (7)(a) does not establish a threshold requirement for an exemption as long as Subsection (3) applies.[28]

We agree with the Court of Claims that the tasks that TOMRA's machines perform occur before the industrial process begins under the general definition in Subsection (7)(a). Therefore, we need to address the department's argument that TOMRA is precluded from claiming an exemption under Subsection (3) based on the temporal limitation of Subsection (7)(a).

If we were to hold, as the department urges, that the temporal limitation in Subsection (7)(a) applies to industrial-processing exemptions sought under Subsection (3),

---

[27] *Id.* at 49 n 13.

[28] See *id.* at 39 ("If 'industrial processing' activity is not occurring under either MCL 205.94o(7)(a) or MCL 205.94o(3), . . . the analysis is complete and the taxpayer is entitled to no exemption."); *id.* at 48 & n 12 (noting that industrial processing "occurs throughout the electric system under MCL 205.94o(7)(a)" but also recognizing "that 'industrial processing' may occur under other circumstances as well, e.g., MCL 205.94o(3)(d)") (citation omitted).

Our additional statement that "the analysis begins" with the general definition in Subsection (7)(a) does not lead us to a different conclusion. *Id.* at 39. The statutes in this case are anomalous because they contain a general definition in one subsection that, standing alone, does not encompass all the things that another subsection specifically identifies (and therefore includes) as "industrial processing" activities. Even so, we still think it makes sense to start with the general definitional section when applying the statutes (if only because it conforms to our usual practice).

12

we would create a conflict between those two provisions. That is because some of the activities listed in Subsection (3) fall outside the period specified in the general definition, i.e., from the movement of raw-materials storage until finished goods are placed in inventory storage. For example, it is difficult to see how the activity of "[p]lanning" or "scheduling" of production in Subsection (3) could ever occur within the time frame of Subsection (7)(a).[29] Perhaps an even better example is the "[d]esign, construction, or maintenance of production or other exempt machinery, equipment, and tooling," which must necessarily precede the period of industrial processing defined in Subsection (7)(a).[30] Or take "[r]esearch or experimental activities," which likely must antedate the period by an even greater margin.[31] What is more, Subsection (3)(d) establishes its own time frame for certain forms of "[i]nspection, quality control, or testing," which must take place "at any time before materials or products first come to rest in finished goods inventory storage."[32] This would be yet another provision rendered either unnecessary or meaningless if the temporal limitation in Subsection (7)(a) applied to Subsection (3). In short, accepting the department's interpretation would lay waste to large swaths of Subsection (3).

When a potential conflict like this surfaces within a statute, "it is our duty to, if reasonably possible, construe them both so as to give meaning to each; that is, to harmonize

---

[29] MCL 205.54t(3)(e); see also MCL 205.94o(3)(e).

[30] MCL 205.54t(3)(f); see also MCL 205.94o(3)(f).

[31] MCL 205.54t(3)(b); see also MCL 205.94o(3)(b).

[32] MCL 205.54t(3)(d); see also MCL 205.94o(3)(d).

them."[33]  Indeed, we must always read the text as a whole, "in view of its structure and of the physical and logical relation of its many parts."[34]  This is because "[c]ontext is a primary determinant of meaning," and for an interpretation that seeks the ordinary meaning of the statute, it is the narrower context drawn from neighboring provisions within a statute that is most appropriate to consider.[35]  Many principles follow from the emphasis on context, including the interpretive canon that words should not, if possible, be rendered surplusage.[36]  Here, extending the temporal limitation in Subsection (7)(a) to all requests for exemptions would, as explained above, leave portions of Subsection (3) without meaning or function within the statute.

There is no reason to wreak such havoc upon the statutes here.  Another contextual canon harmonizes the provisions and illuminates their ordinary meaning: " '[W]here a statute contains a general provision and a specific provision, the specific provision controls.' "[37]  This principle is tailor-made for cases like this one, in which statutory

---

[33] *Nowell v Titan Ins Co*, 466 Mich 478, 483; 648 NW2d 157 (2002).

[34] *Reading Law*, p 167.

[35] *Id.*; see also *id*. at 33 ("This critical word *context* embraces not just textual purpose but also (1) a word's historical associations acquired from recurrent patterns of past usage, and (2) a word's immediate syntactic setting . . . ."); *Ordinary Meaning*, p 147 ("One way to capture generalizable meanings . . . is to conceive of ordinary meaning as semantic meaning that is determined based on facts from the narrow context.").

[36] *Reading Law*, p 167; see also *People v Seewald*, 499 Mich 111, 123; 879 NW2d 237 (2016) ("When possible, we strive to avoid constructions that would render any part of the Legislature's work nugatory.").

[37] *Jones v Enertel, Inc*, 467 Mich 266, 270; 650 NW2d 334 (2002), quoting *Gebhardt v O'Rourke*, 444 Mich 535, 542-543; 510 NW2d 900 (1994) (alteration in original).

provisions would otherwise conflict.[38] The conflict is dissipated by interpreting "the specific provision . . . as an exception to the general one."[39]

In this case, interpreting Subsection (3) as the more specific provision resolves the conflict and accords the statutes their most natural and ordinary meanings. Subsection (3) lists specific activities that constitute industrial processing, whereas the second sentence of Subsection (7)(a) provides a temporal limitation on the general types of activities described in the first sentence of that subsection.[40] Thus, Subsection (3) is the specific provision with regard to the activities it enumerates.[41] As to those activities, then, Subsection (3) controls and the time frame in Subsection (7)(a) is inapplicable. This interpretation reflects a holistic reading of the statutory text and gives each provision its appropriate meaning and

---

[38] *RadLAX Gateway Hotel, LLC v Amalgamated Bank*, 566 US 639, 645; 132 S Ct 2065; 182 L Ed 2d 967 (2012) ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission."); *Reading Law*, p 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails . . . ."). As we stated in *Detroit Edison Co*, 498 Mich at 44, "the rule only applies when there is some statutory tension or conflict between two possible treatments of a subject . . . ." In that case, the canon was inapplicable because we found no conflict between the general definition in Subsection (7)(a) and various express exclusions from that definition carved out in Subsection (6)(b). *Id*. at 45.

[39] *RadLAX Gateway Hotel, LLC*, 566 US at 645; see also *Reading Law*, p 183 ("Under this canon, the specific provision is treated as an exception to the general rule.").

[40] We do not address whether or how the first sentence of Subsection (7)(a) applies to the exemptions in Subsection (3) because that issue is not before the Court.

[41] See *Miller v Allstate Ins Co*, 481 Mich 601, 613; 751 NW2d 463 (2008) ("In order to determine which provision is truly more specific and, hence, controlling, we consider which provision applies to the more narrow realm of circumstances, and which to the more broad realm.").

function.  We therefore conclude that the temporal limitation in Subsection (7)(a) does not apply to the industrial-processing activities in Subsection (3).

## IV.  CONCLUSION

For the reasons set forth above, we hold that the temporal limitation in Subsection (7)(a) does not apply to the activities listed in Subsection (3).  In reaching this conclusion, we further conclude that the rule of strict construction of tax exemptions is inapplicable because the statutes here are unambiguous.  On these bases, we affirm the Court of Appeals decision below and remand the case to the Court of Claims for further proceedings that are consistent with this opinion.

David F. Viviano
Bridget M. McCormack
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh