RETIREMENT HOMES OF THE DETROIT ANNUAL
CONFERENCE OF THE UNITED METHODIST CHURCH, INC v
SYLVAN TOWNSHIP

Docket Nos. 64092, 64093. Argued November 13, 1980 (Calendar No.
6).—Decided December 23, 1982.

Retirement Homes of the Detroit Annual Conference of the
United Methodist Church, Inc., claimed real and personal
property tax exemptions as a charitable institution for the
Chelsea Village Apartments, 24 apartments near its licensed
nursing home and licensed home for the aged in Sylvan Town-
ship. The Michigan Tax Tribunal denied the exemptions. The
Court of Appeals, Bashara, P.J., and Beasley and Daner, JJ.,
reversed, holding that the apartments were within the corpora-
tion's charitable purpose (Docket Nos. 78-4664, 78-4665, 43959).
The township appeals.

In an opinion by Justice Levin, joined by Chief Justice
Fitzgerald and Justices Kavanagh and Ryan, the Supreme
Court *held:*

The Chelsea Village Apartments are not operated in such a
way that there is a gift for the benefit of the general public
without restriction or for the benefit of an indefinite number of
persons, and they do not qualify for a charitable or benevolent
tax exemption.

1. A property tax exemption is in derogation of the principle
that all property shall bear a proportionate share of the tax
burden and will be strictly construed. The general property tax
law does not provide an exemption per se for housing for the
elderly. To qualify for a charitable or benevolent tax exemp-
tion, the property must be used in such a way that there is a
gift for the benefit of the general public without restriction or
for the benefit of an indefinite number of persons.

2. In this case, the operation of the apartments does not
appear to benefit the general public or an indefinite number of

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4] 71 Am Jur 2d, State and Local Taxation §§ 387, 388.
    Homes for the aged as exempt from property taxation. 37 ALR3d
    565.
[3] 71 Am Jur 2d, State and Local Taxation § 368.

persons. The monthly fee charged the residents is designed to cover all operating costs as well as to recover costs of construction. While it does not appear that the apartments are operated for profit, neither does it appear that the residents receive any significant benefit for which they do not pay. It was not shown that the monthly fees are less than market rates for similar apartments. The security, recreational, social, and religious services appear to be incidental to providing a comfortable apartment to those who can afford to pay for it and have not been shown to be of a nature different from those provided by many commercial senior citizen residences. In addition, the apartments are not auxiliary facilities, incidental to other charitable purposes, but are primary facilities devoted to the full-time use of the residents.

Reversed, and the decision of the Tax Tribunal is reinstated.

Justices Williams and Coleman dissented. For designation of an institution as charitable or benevolent, it should be a nonprofit institution of beneficial interest to society. The charging of fees equal to costs does not necessarily prevent classification of an institution as nonprofit. The controlling consideration is whether the fees charged do not exceed what is required to maintain the institution at a reasonable standard of operation. A charitable designation is not limited to relief of poverty; if the benefit conferred has a sufficiently widespread social value, a charitable purpose exists. Aged people require care and attention apart from financial assistance and the supply of this care is as much a charitable and benevolent purpose as the relief of their financial wants.

92 Mich App 560; 285 NW2d 375 (1979) reversed.

## OPINION OF THE COURT

1. TAXATION — EXEMPTIONS — CHARITABLE USE — HOUSING FOR THE ELDERLY.

The general property tax law does not provide an exemption per se for housing for the elderly; to qualify for a charitable or benevolent tax exemption, such housing must be used so as to provide a gift for the benefit of the general public without restriction or for the benefit of an indefinite number of persons (MCL 211.7, 211.9; MSA 7.7, 7.9).

2. TAXATION — EXEMPTIONS — CHARITABLE USE — HOUSING FOR THE ELDERLY.

Housing for the elderly which charged residents a monthly fee designed to cover all operating costs and to recover costs of construction which was equivalent to market rates for similar

housing did not qualify for charitable or benevolent tax exemptions where the facilities were not incidental to other charitable purposes, but were primary facilities devoted to the full-time use of the residents, the services provided for the residents did not differ from those provided by commercial facilities, the residents did not receive any significant benefit for which they did not pay, and the operation of the facilities did not benefit the general public without restriction or an indefinite number of persons (MCL 211.7, 211.9; MSA 7.7, 7.9).

DISSENTING OPINION BY WILLIAMS AND COLEMAN, JJ.

3. TAXATION — EXEMPTIONS — CHARITABLE USE.

A charitable designation is not limited to relief of poverty, and where the benefit conferred has a sufficiently widespread social value, a charitable purpose exists; the charging of fees equal to costs does not necessarily prevent classification of an institution as nonprofit, but the controlling consideration is whether the fees exceed what is required to maintain the institution at a reasonable standard of operation (MCL 211.7, 211.9; MSA 7.7, 7.9).

4. TAXATION — EXEMPTIONS — CHARITABLE USE — HOUSING FOR THE ELDERLY.

Operation of housing facilities for the elderly which includes care of and attention to residents is as charitable and benevolent as relief of their financial wants and may qualify for exemption from taxation (MCL 211.7, 211.9; MSA 7.7, 7.9).

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Robert D. Dunwoodie* and *Ronald S. Holliday)* for Retirement Homes.

*Keusch & Flintoft* (by *Peter C. Flintoft)* for Sylvan Township.

LEVIN, J. Retirement Homes of the Detroit Annual Conference of the United Methodist Church, Inc., claimed a real and personal property tax exemption for the Chelsea Village Apartments.[1]

The Tax Tribunal, relying on *Michigan Baptist Homes & Development Co v City of Ann Arbor,*

---

[1] The tax years are 1973 through 1976.

396 Mich 660; 242 NW2d 749 (1976), denied exemption. The Court of Appeals reversed, saying that *Michigan Baptist Homes* was distinguishable.[2]

We are of the opinion that *Michigan Baptist Homes* is controlling and reverse.

I

Retirement Homes is a nonprofit, non-stock corporation. The board of trustees is elected by the Detroit Annual Conference of the United Methodist Church.[3]

The Chelsea facility is comprised of a licensed nursing home, a licensed home for the aged, and the Chelsea Village Apartments. Thirty-six persons reside in the apartments.

The nursing home and the home for the aged have been tax-exempt since 1905. Retirement Homes acquired land adjacent to these facilities in 1967 and 1968 and completed construction of the apartments in 1972. There are 24 apartments; 18 single-bedroom, 4 double-bedroom, and 2 efficiencies.[4]

There was evidence that the apartments were constructed to "improve the age mix" by attracting a younger group of retirees, those over the age of 65 but younger than those normally requiring institutional care, and to establish a more orderly

---

[2] 92 Mich App 560; 285 NW2d 375 (1979).

[3] The trustees serve without pay. Retirement Homes operates facilities in two locations: the Boulevard Temple Home in Detroit, and the Chelsea Home in Sylvan Township, Washtenaw County. A total of 435 persons reside at the facilities. It is not clear how many reside in the nursing home and the home for the aged at Chelsea.

[4] The Crippen Memorial Building, a community center, was not included in the assessment.

progression of elderly persons through the various facilities in Chelsea.

The apartments are designed for independent living. Residents are responsible for their own medical and dental care as well as obtaining their own meals, although meals can be purchased at cost from the Home for the Aged. Residents have available 24-hour emergency medical service, counseling, full access to and involvement in the social and therapeutic activities and programs conducted at the Chelsea facility, 24-hour maintenance service, utilities, trash removal, lawn care, snow removal, painting and repairs, and free transportation.[5]

Residents are charged a monthly fee which is designed to cover utility and other direct costs and to amortize the cost of construction over a 20-year period. The monthly fee does not include the income which Retirement Homes could have earned by investing the funds that were used in the construction.[6]

---

[5] Retirement Homes has an open admissions policy, and all persons regardless of race, creed, color, sex, or religion may be admitted to any of the facilities as long as they are 65 years of age or older and mentally capable of living in a congregate setting.

Residents may participate in the resident council, an advisory board elected by the residents of the Chelsea facility, which renders advice and assistance to the administrator regarding all aspects of life at the Chelsea facility; participate in the Chelsea Home Reporter, a newsletter; attend and participate in Sunday chapel services; and participate in recreational groups, in ceramic and other craft activities, in bible study and similar religious activities, and in excursion groups. All residents of the Chelsea facility have access to the Crippen Memorial Building.

Residents participate in the daily operation of the Chelsea facility and provide a substantial amount of voluntary assistance to residents of the nursing facility and home for the aged.

[6] The fee schedules were as follows:

|  | 1973 | 1977 | 1978 |
|---|---|---|---|
|  | (Monthly) | (Monthly) | (Monthly) |
| Two Bedrooms | $190.00 | $243.00 | $265.00   + |

Retirement Homes produced evidence which tended to show that the annual expense of operating the apartments exceeded the fee charged to the residents, but the Tax Tribunal concluded that "[i]t is not clear whether [the apartments] lost money, made money or broke even".[7]

Applicants are required to supply medical and financial information to assist Retirement Homes in properly placing them within the facilities. Retirement Homes considers that Supplemental Security Income payments are only available to residents of licensed facilities. The apartments are not a licensed facility.

Retirement Homes claimed that no one was ever refused care or evicted because of inability to pay fees. Yet it was acknowledged that residents of the apartments who became unable to pay the monthly fee were asked to transfer to one of the

|  |  |  | Real Estate Tax $50.00 per month |
| --- | --- | --- | --- |
| One Bedroom | $175.00 | $208.00 to $220.00 | $225.00 to $240.00 + Real Estate Tax $41.00 per month |
| Efficiency | $140.00 | $180.00 | $200.00 + Real Estate Tax $35.00 per month |

The township introduced evidence of the rent charged by privately owned apartments in the same area for the same years. Two-bedroom apartments, roughly comparable in size, rented for $160 to $175 in 1973 and $187 to $240 in 1977 and 1978.

[7] While Retirement Homes keeps a separate accounting of the income from the apartments, it does not of the expenses; the expenses were only estimates. Three-sevenths to one-half of the total expenses claimed by Retirement Homes was for depreciation calculated on a 20-year useful life for the facilities. Other evidence presented tended to show that the actual useful life as calculated by the Retirement Homes auditors was 40 years. If 40 years was used, it would have shown a small profit during the tax years.

other facilities at Chelsea because they could not obtain government assistance unless they were residents of a licensed facility.[8]

## II

. The Court of Appeals, in reversing the Tax Tribunal,[9] distinguished *Michigan Baptist Homes.*

[8] When asked if any resident was or had become indigent while residing at the apartments, the executive director and administrator of the Chelsea facility replied that there was currently one resident who was moving from the apartments into one of the other facilities and that three other residents had already moved from the apartments to one of the other facilities when those residents could no longer meet the monthly payments.

[9] The Tax Tribunal declared that Retirement Homes could obtain a property tax exemption for the apartments in either of two ways. Retirement Homes could prove beyond a reasonable doubt that the apartments "as a separate facility [are] entitled to the exemption".

The Tax Tribunal found that the apartments were not an inextricable facet of the other Retirement Homes facilities. The tribunal noted that residents of the apartments made up a minor portion of Retirement Homes' total residential population, 36 out of 435, and that the residents may leave the apartments at any time because they have no formal lease. The tribunal also found that the involvement of the residents of the apartments with the residents of the nursing center and home for the aged facilities was strictly voluntary. It could not be depended upon as a permanent feature of the apartments, and, in any case, Retirement Homes had failed to demonstrate that the 36 residents "contribute significantly" to the lives of the other residents. Further, the failure to license the apartments as an old age home and the emphasis on an independent lifestyle for the residents of the apartments also sets the apartments apart from the other facilities.

With respect to the apartments' own qualification for a charitable exemption, the tribunal said that decisions of this Court require that the building and property be occupied by the claimant solely for the purposes for which it was incorporated. The tribunal found that the operation of the apartments, which admitted residents on the basis of their health and ability to pay the monthly fee, was inconsistent with the Retirement Homes' articles of incorporation which indicated that its purpose was to provide homes for the aged without reference to the financial resources of the residents. Additionally, Retirement Homes claimed to be incorporated for purely benevolent, charitable, educational, and religious purposes, but the economic and health restrictions on admission to the apartments prevented the operation of the apartments from benefiting the general public without restriction as is required of a charity. The tribunal also found that the apartments were merely "a method whereby [the apartment] residents assure themselves a bed in a nursing home upon becoming

The construction of the apartments was financed entirely by gifts, donations, and bequests, rather than, as in *Michigan Baptist Homes,* a mortgage and sale of debentures. Because Retirement Homes incurred no debt in financing construction, the monthly charge was set to recover only direct expenses and fund replacement, not payment of interest. A life-care contract with forfeiture was not required, only a monthly fee. In *Michigan Baptist Homes* each resident was provided ten days of free care in the nursing center each year, which could be accumulated to a maximum of 30 days. Residents of the apartments were provided with 24-hour emergency medical service without additional charge and could transfer to the nursing care facility if necessary.

The Court regarded *Gull Lake Bible Conference Ass'n v Ross Twp,* 351 Mich 269; 88 NW2d 264 (1958), to be more analogous. In *Gull Lake,* this Court held that the picnic, recreation, and housing facilities operated by the Gull Lake Bible Conference Association qualified for a charitable property tax exemption, although fees for use of the facilities were charged, because the charitable purpose of the association was to promote Bible study gatherings and the availability of the facilities was necessary to obtain satisfactory attendance.[10]

disabled" and "a convenient method of keeping a ready supply of prospective nursing home and old age home residents on hand". The tribunal concluded that the apartments' operation was essentially the same as the retirement home denied an exemption by this Court in *Michigan Baptist Homes & Development Co v City of Ann Arbor,* 396 Mich 660; 242 NW2d 749 (1976).

[10] The Court of Appeals reasoned that since the township conceded that the purpose of the apartments was to "allow residents to mix and to provide a steady supply of clients to the Chelsea home" and the facilities in the cited case had been deemed to be used for charitable purposes because they were used to attract participants for the Bible Association's charitable activities, therefore the use of the apartments was within Retirement Homes' charitable purpose and eligible for tax exemption.

## III

Retirement Homes claims real and personal property tax exemptions under provisions of the general property tax law exempting the personal property of charitable institutions and real property owned and occupied by charitable institutions while occupied solely for the purposes for which the institution is incorporated.[11]

A property tax exemption is in derogation of the principle that all property shall bear a proportionate share of the tax burden and, consequently, a tax exemption will be strictly construed.[12]

In *Michigan Baptist Homes*, this Court declared that, to qualify for a charitable or benevolent tax exemption, property must be used in such a way that it "benefit the general public without restriction".[13] Courts in other jurisdictions have expressed this concept in the following language:

"[C]harity * * * [is] a *gift*, to be applied consistently

[11] "The following property shall be exempt from taxation:

* * *

"Fourth, such real estate as shall be owned and occupied by library, benevolent, charitable, educational or scientific institutions and memorial homes of world war veterans incorporated under the laws of this state with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated * * *." MCL 211.7; MSA 7.7.

"The following personal property shall be exempt from taxation:

"First, the personal property of charitable, educational and scientific institutions, incorporated under the laws of this state * * *." MCL 211.9; MSA 7.9.

[12] *Michigan Baptist Homes v Ann Arbor, supra; Evanston YMCA Camp v State Tax Comm*, 369 Mich 1, 7; 118 NW2d 818 (1962); *Detroit v Detroit Commercial College*, 322 Mich 142, 149; 33 NW2d 737 (1948); *St Joseph's Church v Detroit*, 189 Mich 408, 414; 155 NW 588 (1915).

[13] *Michigan Baptist Homes, supra*, p 671. See *Auditor General v R B Smith Memorial Hospital Ass'n*, 293 Mich 36, 38; 291 NW 213 (1940).

with existing laws, *for the benefit of an indefinite number of persons,* either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or *otherwise lessening the burdens of government.*"[14] (Emphasis supplied.)

The question presented can thus be rephrased: Does Retirement Homes operate the apartments in such a way that there is a "gift" for the benefit of "the general public without restriction" or "for the benefit of an indefinite number of persons"?

We conclude that there is no "gift" for the benefit of an indefinite number of persons or for the benefit of the general public without restriction in the operation of the apartments. The monthly fee is designed to cover all operating costs as well as to recover the construction costs of the apartments. While it does not appear that the

---

[14] It appears that this description was first employed by the Massachusetts Supreme Court in *Jackson v Phillips,* 96 Mass (14 Allen) 539 (1867), and that it was subsequently adopted in the following cases: *United Presbyterian Ass'n v Bd of County Comm'rs,* 167 Colo 485, 494-495; 448 P2d 967, 971 (1968); *Coyne Electrical School v Paschen,* 12 Ill 2d 387, 398; 146 NE2d 73, 79 (1957); *Boston Chamber of Commerce v Assessors of Boston,* 315 Mass 712, 716; 54 NE2d 199, 201; 152 ALR 174 (1944); *In re Jr Achievement of Greater Minneapolis, Inc v State,* 271 Minn 385, 390; 135 NW2d 881 (1965); *Salvation Army v Hoehn,* 354 Mo 107; 188 SW2d 826 (1945); *Franciscan Tertiary Province of Missouri, Inc v State Tax Comm,* 566 SW2d 213 (Mo, 1978); *Presbyterian Homes v Div of Tax Appeals,* 55 NJ 275; 261 A2d 143 (1970).

The following cases require that a charity relieve the burden of government or benefit the general welfare. *American Society of Agricultural Engineers v St Joseph Twp,* 53 Mich App 45; 218 NW2d 685 (1974); *David Walcott Kendall Memorial School v Grand Rapids,* 11 Mich App 231; 160 NW2d 778 (1968); *Friendship Manor Corp v Tax Comm,* 26 Utah 2d 227, 239; 487 P2d 1272, 1277 (1971); *Willows v Munson,* 43 Ill 2d 203, 208; 251 NE2d 249, 252 (1969); *Haines v St Petersburg Methodist Home,* 173 So 2d 176 (Fla App, 1965); *Fifield Manor v Los Angeles County,* 188 Cal App 2d 1; 10 Cal Rptr 242 (1961).

apartments are operated for a profit,[15] neither does it appear that the residents receive any significant benefit that they do not pay for. There is no "gift" to the residents.

The operation of the apartments does not appear to benefit the general public. Its residents are chosen on the basis of their good health, their ability to pay the monthly charge, and, generally, their ability to live independently.[16]

[15] A corporation does not qualify for a tax exemption merely because it is structured to be nonprofit and in fact makes no profit. By the same token, a nonprofit corporation will not be disqualified for a charitable exemption because it charges those who can afford to pay for its services as long as the charges approximate the cost of the services. *Michigan Sanitarium & Benevolent Ass'n v Battle Creek*, 138 Mich 676, 683; 101 NW 855 (1904); *Auditor General v R B Smith Memorial Hospital Ass'n, supra*, p 39; *Gull Lake Conference v Ross Twp, supra.*

[16] Retirement Homes contends that it has not evicted anyone from the apartments who became unable to pay the monthly fee and has admitted persons whose total assets would qualify them as indigent. Evidence was presented to the Tax Tribunal which tended to show that of the original residents admitted to the apartments, three had disclosed assets which respectively totalled zero dollars, $5,000, and $5,073. Although no one has been evicted, all who have become incapable of paying a monthly fee have been transferred to one of the licensed facilities where they may receive government aid. Merely because a few individuals with minimal disclosed assets were admitted to the apartments it does not follow that any charity was involved in their admissions since Retirement Homes never claimed that monthly payments for these residents were waived or even reduced. While 55% of the residents in the various Retirement Homes facilities are unable to pay the costs of their care, no evidence was presented regarding what percentage, if any, of the apartments' residents were subsidized by Retirement Homes.

In *Michigan Sanitarium & Benevolent Ass'n v Battle Creek, supra*, and *Auditor General v R B Smith Memorial Hospital Ass'n, supra*, the nonprofit corporations admitted and treated all charity cases which came to their doors. Medical care was provided by those corporations without regard to ability to pay the cost of the service. Admission to the apartments, if not to the other facilities, is dependent on ability to pay.

The cost of emergency medical care provided to residents of the apartments does not appear to be significant.

Retirement Homes quoted extensively from *In re Tax Appeals of United Presbyterian Homes*, 428 Pa 145; 236 A2d 776 (1968); *Fifield Manor v Los Angeles County, supra*, and *Franciscan Tertiary Province of Missouri, Inc v State Tax Comm, supra*, to support its argu-

The asserted distinctions between the apartments in *Michigan Baptist Homes* and the apartments in the instant case do not justify treating these apartments differently under the general property tax law. In both cases residents of the apartments were charged fees designed to cover all costs, including the cost of construction. In the instant case, the monthly fees did not, because no funds were borrowed, include an assessment to cover interest on construction funds. However, it was not shown (see fn 6) that the monthly fee was substantially less or indeed less at all than the market rent.

Retirement Homes stresses that it did not require life leases. The monthly fees were, however, set to arrive at the same result in both cases, an economically self-sustaining residence. The volunteer services provided by residents of the apartments cannot justify tax exemption any more than volunteer services supplied by the active elderly who live in their own homes or apartments. The security, recreational, social, and religious services appear to be incidental to providing a comfortable apartment to those who can afford to pay for it and have not been shown to be of a nature differ-

ment that charity is not limited to providing for the indigent and that the problems of the elderly are more than economic. We find these cases unpersuasive because it appears that a tax exemption was granted, at least in part, because many of the residents were subsidized either by the home, by the government, or by both. In *Fifield Manor,* each of the three homes involved were losing from $39 to $47 per month per resident, but nevertheless persons unable to pay the entrance fee were admitted and their fees were covered by donations or waived. Almost half the residents of the home in *United Presbyterian Homes* were receiving government assistance, and the operations were found to operate at a loss. Similarly, in *Franciscan Tertiary Province* the rents were less than one-half actual cost and one-sixth of the residents received a government rent supplement to help make the reduced payment. In the instant case, Retirement Homes failed to show that the rent of any resident of the apartments was subsidized on a regular basis.

ent than those provided by many commercial senior citizen residences.

In *Michigan Baptist Homes, supra,* pp 671-672, this Court concluded that the apartments for which a tax exemption was there sought did "not serve the elderly generally, but rather provide[d] an attractive retirement environment for those among the elderly who [had] the health to enjoy it and who [could] afford to pay for it". The Court reasoned that the Legislature did not intend "to grant the claimed exemptions to these relatively favored individuals while at the same time granting only limited tax relief to the less affluent elderly who rent or own modest homes". The Court continued, "[w]e are convinced that the Legislature has given no clear mandate to exempt elderly housing per se".

In *Gull Lake,* the auxiliary recreational facilities were used occasionally, and were incidental and not the primary facility. Here the facilities are not auxiliary or incidental. The apartments are the primary facility insofar as the residents are concerned; what is here sought is an exemption for housing devoted to the full-time use of residents. If a nonprofit corporation can build housing for the elderly and obtain a tax exemption for the housing because of incidental auxiliary facilities which it subsidizes, other nonprofit corporations should be able to build or, indeed, purchase housing for rent to other groupings of society and obtain tax exemptions by subsidizing auxiliary facilities which serve their charitable purposes, *e.g.,* day care centers in connection with residences rented to young married people and recreational facilities adjoining residences rented to the unmarried. The auxiliary facilities might include an educational component advancing the charitable purpose to attract

and benefit those using day care or recreational facilities.

This Court's decision in *Michigan Baptist Homes* was not limited to the facts of that case. The Court understood and said that what was there involved was whether a tax exemption was to be conferred on housing for the elderly although persons residing in the facility paid the cost of the housing provided. The Court concluded that the Legislature did not intend that housing for the elderly should be tax exempt where only those persons who can afford the cost of the housing benefit.

Reversed and the decision of the Tax Tribunal is reinstated.

Fitzgerald, C.J., and Kavanagh and Ryan, JJ., concurred with Levin, J.

Williams and Coleman, JJ. For reasons set forth in Justice Coleman's opinion in *Michigan Baptist Homes & Development Co v Ann Arbor*, 396 Mich 660; 242 NW2d 749 (1976), we dissent.

Riley, J., took no part in the decision of this case.