*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WEST MICHIGAN ANNUAL CONFERENCE OF
THE UNITED METHODIST CHURCH,

        Petitioner-Appellee,

v

CITY OF GRAND RAPIDS,

        Respondent-Appellant.

FOR PUBLICATION
February 25, 2021
9:05 a.m.

No. 352703
Tax Tribunal
LC No. 19-001186-TT

Before: SWARTZLE, P.J., and MARKEY and TUKEL, JJ.

TUKEL, J.

Since 1893, the General Property Tax Act has generally excluded a "parsonage" from being subject to the property tax. In this case, Respondent, the City of Grand Rapids, argues that a home owned by petitioner and lived in by Reverend Doctor Margie Crawford, an ordained minister who does not have a designated congregation but who occupies an administrative role overseeing multiple congregations for petitioner, does not meet the statutory definition of "parsonage." The Michigan Tax Tribunal (MTT) disagreed, upholding the exemption. Respondent thus appeals as of right the MTT's order which denied its motion for summary disposition under MCR 2.116(C)(10), and which granted summary disposition under MCR 2.116(I)(2) to petitioner, West Michigan Annual Conference of the United Methodist Church.

In essence, the dispute boils down to which of two possible interpretations of the term "parsonage" is correct: does that term require that (1) property be owned by a religious society and occupied by an ordained minister who serves a particular congregation; or (2) does property owned by a religious society and occupied by an ordained minister who does not serve a particular congregation, but who otherwise works as a minister on behalf of the religious society also qualify. Respondent argues for the first option, while petitioner argues that the second, more expansive, possibility applies. We agree with petitioner that given the undisputed facts of this case and the legal definition of parsonage, the house qualifies for the tax exemption. We therefore find no legal error in the MTT's grant of summary disposition to petitioner, and we affirm its order.

# I. UNDERLYING FACTS

The basic facts of this case are straightforward and agreed to by the parties. Rev. Dr. Crawford is an ordained minister who works for petitioner in an administrative capacity in the church hierarchy. Rev. Dr. Crawford does not serve any specific congregation, but instead occupies an administrative role as the "District Superintendent" overseeing petitioner's "Midwest District," which encompasses 91 individual churches. In her role as District Superintendent, Rev. Dr. Crawford "oversee[s] the total ministry of the clergy and of the churches in the communities of the District." As part of this function, Rev. Dr. Crawford gives at least one guest sermon per year at each of the churches in her district; she also provides pastoral care "to anyone with a physical or mental ailment within [her] District" and could be "called upon to serve as Chaplain, if needed."

Rev. Dr. Crawford lives in a residential house owned by petitioner and located in Grand Rapids (the residence). Petitioner applied for tax exemption for the residence for tax year 2019, but respondent denied petitioner's application and assessed the residence as having a taxable value of $98,200. Petitioner then made the same request for tax exemption "before the appropriate local Board of Review," but the Board of Review also denied petitioner's request. Petitioner then appealed that decision to the MTT.

Respondent eventually moved for summary disposition and argued that the residence did not qualify as a "parsonage" under MCL 211.7s because Rev. Dr. Crawford does not minister to a specific congregation.[1] Petitioner responded that Rev. Dr. Crawford was not required to minister to a specific congregation for the residence to qualify as a parsonage. The MTT agreed with petitioner and granted it summary disposition, concluding that the residence qualifies as a parsonage. This appeal followed.

# II. STANDARD OF REVIEW

Unless there is fraud, this Court's review of MTT "decisions is limited to determining whether the MTT erred in applying the law or adopted a wrong legal principle." *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 627; 752 NW2d 479 (2008). If this Court's "review requires the interpretation and application of a statute, that review is de novo." *Power v Dep't of Treasury*, 301 Mich App 226, 230; 835 NW2d 662 (2013). "Though this Court will generally 'defer to the Tax Tribunal's interpretation of a statute that it is delegated to administer,' that deference will not extend to cases in which the tribunal makes a legal error. Thus, agency interpretations are entitled to 'respectful consideration' but cannot control in the face of

---

[1] MCL 211.7s provides:

> Houses of public worship, with the land on which they stand, the furniture therein and all rights in the pews, and any parsonage owned by a religious society of this state and occupied as a parsonage are exempt from taxation under this act. Houses of public worship includes buildings or other facilities owned by a religious society and used predominantly for religious services or for teaching the religious truths and beliefs of the society.

contradictory statutory text." *SBC Health Midwest, Inc v City of Kentwood*, 500 Mich 65, 71; 894 NW2d 535 (2017) (citations and footnotes omitted).

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a complaint and is reviewed de novo. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205-206; 815 NW2d 412 (2012). This Court reviews a motion brought under MCR 2.116(C)(10) "by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). Summary disposition "is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). "Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted).

Finally, "[s]ummary disposition is properly granted to the opposing party [under MCR 2.116(I)(2)] if it appears to the court that that party, rather than the moving party, is entitled to judgment." *Sharper Image Corp v Dep't of Treasury*, 216 Mich App 698, 701; 550 NW2d 596 (1996). "Additionally, statutory interpretation is a question of law subject to review de novo." *Mich Milk Producers Ass'n v Dept of Treasury*, 242 Mich App 486, 491; 618 NW2d 917 (2000).

## III. ANALYSIS

The MTT correctly applied the general definition of "parsonage," that is, the home of a parson, as well as the remainder of the statutory language of the exemption.[2] Contrary to respondent's argument, the statute has no requirement that in order for a residence to constitute a "parsonage," its resident be a pastor who ministers to a particular congregation. The statute does require, though, that the residence be "used as a parsonage." Therefore, so long as the resident is a minister, who is not retired or otherwise unconnected to church functions, such a home is "used as a parsonage" and therefore qualifies for the exemption.

### A. LEGISLATIVE ACQUIESCENCE

As an initial matter, petitioner argues that because the Legislature has not overruled or modified *St Joseph's Church v City of Detroit*, 189 Mich 408; 155 NW 588 (1915), the rule set down in that case is settled and we cannot modify it, by virtue of a doctrine known as "legislative acquiescence." That argument is not viable, however because "[I]t has been the rule in Michigan

---

[2] Throughout this opinion, we use the terms "church" and "religious society" interchangeably, because although the statutory term is "religious society," the particular society at issue here is a church. Our holding of course applies to any religious society of any faith, regardless of the nomenclature it uses to describe itself. The same goes for our use of the terms "minister" or "pastor"; although many such societies or faiths use different words, and the statute applies equally to each of them, "minister" is the term used by the religious society involved in this case.

since at least *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999), that the doctrine of legislative acquiescence is not recognized in this state." *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 209 n 8; 731 NW2d 41 (2007). Indeed, "the legislative acquiescence doctrine is a highly disfavored doctrine of statutory construction; sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its words, not from its silence." *Id.* (quotation marks and citation omitted). Thus, the doctrine of legislative acquiescence has no force in this state and we instead rely on normal principles of statutory interpretation to determine the meaning of "parsonage" as used in MCL 211.7s.[3]

## B. THE PARSONAGE EXCEPTION

The parties agree that petitioner is a religious society and that it owns the residence. They further agree that Rev. Dr. Crawford is an ordained minister; that she lives in the residence; and that, in her role as District Superintendent, Rev. Dr. Crawford does not minister to a particular congregation. The purely legal issue before us is whether an ordained pastor must minister to a particular congregation for his or her residence to qualify as a parsonage. As such, this case presents a question of statutory interpretation regarding the definition of a "parsonage" within the meaning of MCL 211.7s, which we review de novo.

## 1. RULES OF CONSTRUCTION

This Court and the Michigan Supreme Court have described the rules of statutory construction as follows:

> The paramount rule of statutory interpretation is that we are to effect the intent of the Legislature. To do so, we begin with the statute's language. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we enforce the statute as written. In reviewing the statute's language, every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory. [*PNC Nat'l Bank Ass'n v Dep't of Treasury*, 285 Mich App 504, 506; 778 NW2d 282 (2009), quoting *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001).]

"Unless defined in the statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *In re Smith Estate*, 252 Mich App 120, 124; 651 NW2d 153 (2002); MCL 8.3a. Nevertheless, "technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." MCL 8.3a. As our Supreme Court has noted on numerous occasions in interpreting statutes, "[i]f the language is plain and unambiguous, then judicial construction is neither necessary nor permitted." *Johnson v Pastoriza*, 491 Mich 417, 436; 818 NW2d 279 (2012). See also *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010); *Griffith v State Farm Mut Auto Ins Co,* 472 Mich 521,

---

[3] Although petitioner is incorrect about the doctrine of legislative acquiescence, it is correct that we are nevertheless bound by *St Joseph's*. See *Associated Builders & Contractors v City of Lansing*, 499 Mich. 177, 191-192; 880 NW2d 765 (2016), discussed later in this opinion.

526; 697 NW2d 895 (2005). Finally, "[t]he provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments." MCL 8.3u.

In addition, "[a] property tax exemption is in derogation of the principle that all property shall bear a proportionate share of the tax burden and, consequently, a tax exemption will be strictly construed." *Retirement Homes of Detroit Annual Conference of United Methodist Church, Inc v Sylvan Twp, Washtenaw Co*, 416 Mich 340, 348; 330 NW2d 682 (1982). The rule that tax exemptions are to be strictly construed in favor of the taxing authority is applied "[i]n general." *Mich United Conservation Clubs v Lansing Twp*, 423 Mich 661, 664; 378 NW2d 737 (1985). "However, this rule does not mean that we should give a strained construction which is adverse to the Legislature's intent." *Id*. at 665, cited by *TruGreen Ltd Partnership v Dep't of Treasury*, ___ Mich App ___, ___; ___ NW2d ___ (2013) (Docket No. 344142); slip op at 8 (SWARTZLE, J., dissenting). Indeed, "because the canon requiring strict construction of tax exemptions does not help reveal the semantic content of a statute, it is a canon of last resort." *TOMRA of North America, Inc v Dep't of Treasury*, 505 Mich 333, 343; ___ NW2d ___, ___ (2020). Furthermore, as regards both of the cited rules of construction of tax law, deference to the Tax Tribunal and narrow construction of tax exemptions, it is important to bear in mind that they each are just those—rules of construction. As we have noted, when statutory language is clear and unambiguous, judicial construction is neither necessary nor permitted.

## 2. STATUTORY HISTORY

MCL 211.7s originally was enacted as 1893 PA 206, and was most recently amended by 1980 PA 142. The language of the statute relevant to this case has remained essentially unchanged since its original enactment in 1893[4] and today MCL 211.7s provides:

> Houses of public worship, with the land on which they stand, the furniture therein and all rights in the pews, and any parsonage owned by a religious society of this state and occupied as a parsonage are exempt from taxation under this act. Houses of public worship includes buildings or other facilities owned by a religious society and used predominantly for religious services or for teaching the religious truths and beliefs of the society.

Thus, as an initial matter, the relevant statutory language, "any parsonage owned by a religious society of this state and occupied as a parsonage" is unchanged from the original act, except that

---

[4] As originally enacted, the statute exempted the following from all taxation under the act:

> All houses of public worship, with the land on which they stand, the furniture therein and all rights in the pews, and also any parsonage owned by any religious society of this State and occupied as such. [1893 PA 206.]

the more archaic language of "and occupied as such" has been updated to "occupied as a parsonage," along with some minor punctuation changes.[5]

<hr />

[5] To the extent we consider the common understanding of a word or phrase at the time it was adopted by the legislature, which we discuss later in this opinion, it is the original 1893 enactment which is controlling because, despite more than 30 reenactments, the language of the parsonage exemption has remained substantively unchanged throughout those years. See MCL 8.3u ("The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments."). For purposes of this case, the relevant statutory language from the 1893 act was "any parsonage owned by any religious society of this State and occupied as such." As noted, none of the more than 30 acts addressing the parsonage exception altered that language in any material way.

Indeed, 1901 PA 44 made no changes; 1909 PA 309 merely deleted the comma after "houses of public worship"; 1911 PA 174 and 1919 PA 331 made no changes from the previous versions; and 1925 PA 55 reincluded the comma after "houses of public worship" and ceased capitalizing the word "State." Those changes did not affect the substance of the act.

A whole series of amendments then made no change whatsoever to the previous versions of the exemption. See 1927 PA 118; 1931 PA 42; 1933 PA 243; 1939 PA 232; 1941 PA 125; 1942 (2nd Ex Sess) PA 8; 1943 PA 131; 1945 PA 76; 1946 (Ex Sess) PA 24; 1949 PA 24; 1949 PA 55; 1951 PA 169; 1952 PA 54; 1955 PA 46; 1958 PA 190; 1960 PA 155; 1961 PA 238; 1963 PA 148; 1966 PA 320; 1968 PA 342; 1971 PA 109; 1971 PA 189; 1974 PA 358; and 1976 PA 135. The 1931 and 1963 acts changed the catch-lines of the exemption but made no other changes. Because "[t]he catch line heading of any section of the statutes that follows the act section number shall in no way be deemed to be a part of the section or the statute, or be used to construe the section more broadly or narrowly than the text of the section would indicate, but shall be deemed to be inserted for purposes of convenience to persons using publications of the statutes," MCL 8.4b, those two changes did not alter the exemption in any substantive way.

In 1976, the legislature added a second sentence to the exemption, which defined the term "Houses of public worship" as including "buildings or other facilities owned by a religious society and used exclusively for religious services or for teaching the religious truths and beliefs of the society," but left intact the existing relevant statutory language "any parsonage owned by any religious society of this state and occupied as such." 1976 PA 432. In 1978, the legislature changed the beginning of the statute from "All houses of public worship" to "Houses of public worship," 1978 PA 54, which worked no change in meaning. The legislature also made a minor change regarding parsonages, changing the phrase "and also any parsonage owned by *any* religious society" to "and any parsonage owned by *a* religious society" (italics added to highlight amendment). *Id*. "A" and "any" have the same meaning as used in the amendment, so 1978 PA 54 was simply a reenactment of the previous version. See *Allstate Ins Co v Freeman*, 432 Mich 656, 698; 443 NW2d 734 (1989) (" '[a]' or 'an' is an indefinite article often used in the sense of 'any' . . . .").

Finally, the present version of the exemption was enacted in 1980. The 1980 amendment, 1980 PA 142, made no material amendments to the exemption at issue here, simply using more modern

### 3. THE CASELAW

#### a. MICHIGAN SUPREME COURT

Despite Michigan's long history of a statutory parsonage exemption from property taxes, few cases have actually addressed it or had occasion to define a "parsonage." Indeed, the parties have identified only three cases, *St Joseph's Church v City of Detroit*, 189 Mich 408; 155 NW 588 (1915); *Saint Matthew Lutheran Church v Delhi Twp, Ingham Co*, 76 Mich App 597; 257 NW2d 183 (1977); and *St John's Evangelical Lutheran Church v City of Bay City*, 114 Mich App 616; 319 NW2d 378 (1982),[6] that they believe address the issue; our review of the relevant caselaw has not discovered any additional cases.[7] *Saint Matthew* and *St John's* were each decided by this Court before November 1, 1990, and, therefore present, at most, persuasive authority. See *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted) ("Although cases

---

language and word order, including "occupied as a parsonage" in place of a parsonage "used as such." It now provides, "Houses of public worship, with the land on which they stand, the furniture therein and all rights in the pews, and any parsonage owned by a religious society of this state and occupied as a parsonage are exempt from taxation under this act." *Id*. The 1980 act made a substantive change which does not affect this case: it changed the definition of "Houses of public worship" from including "buildings or other facilities owned by a religious society and used *exclusively* for religious services or for teaching the religious truths and beliefs of the society," to "buildings or other facilities owned by a religious society and used *predominantly* for religious services or for teaching the religious truths and beliefs of the society." *Id*. (emphasis added to highlight amendment).

Thus, although the parsonage exemption has been "re-enacted, amended or revised" on numerous occasions, MCL 8.3u, its provisions "are the same as those of prior laws" and thus "shall be construed as a continuation of such laws and not as new enactments." In other words, to the extent the legislature's understanding of a word or phrase is at issue, it is to the original 1893 act to which we look in determining that understanding, as all the subsequent amendments have simply been reenactments and thus continuations of the 1893 legislation. See *id*.; *People v Bolling*, 140 Mich App 606, 611-612; 364 NW2d 759 (1985) (construing the word "timber" as it was understood by the Legislature in 1867, when the statute at issue was enacted).

[6] Given the similarity of the names of the churches in the three leading cases, we will sometimes include the name of the respondent, which may aid the reader in distinguishing the cases.

[7] *Congregation B'Nai Jacob v City of Oak Park*, 102 Mich App 724; 302 NW2d 296 (1981), addressed a situation in which the religious society had multiple clergy, owned multiple homes, and each of the clergy resided in one of the homes. The legal question thus was whether each of the homes qualified for the tax exemption under the statute, such "that a given congregation may have multiple tax exempt parsonages." *Id*. at 728. We held "that such multiple exemptions are within the scope of the statute." *Id*. That question is not presented in this case, although we discuss *Congregation B'Nai Jacob* later in this opinion.

decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority."). *St Joseph's*, however, was decided by our Supreme Court and although it was decided more than 100 years ago it retains its precedential authority. See *Associated Builders & Contractors v City of Lansing*, 499 Mich. 177, 191-192; 880 NW2d 765 (2016) ("The Court of Appeals is bound to follow decisions by this Court except where those decisions have clearly been overruled or superseded and is not authorized to anticipatorily ignore our decisions where it determines that the foundations of a Supreme Court decision have been undermined."). Consequently, to construe how earlier cases have defined "parsonage," we first address *St Joseph's* before turning to *Saint Matthew* and *St John's*.

In *St Joseph's v Detroit*, our Supreme Court addressed whether the parsonage exception applied to a residence while it was under construction, before the minister moved into it. *St Joseph's*, 189 Mich at 410-412. To answer that question, the *St Joseph's* Court examined the 1911 version of the parsonage exception, 1911 PA 174, which provided that the following was exempt from taxation:

> All houses of public worship with the land on which they stand, the furniture therein and all rights in the pews, and also any parsonage owned by any religious society of this state and occupied as such. [1911 PA 174; *St Joseph's*, 189 Mich at 413.][8]

Immediately after quoting the statutory language, the *St Joseph's* Court held:

> A parsonage may be defined as a house in which a minister of the gospel resides. In its ecclesiastical sense the word was 'glebe (or land) and house' belonging to a parish appropriated to the maintenance of the incumbent, or settled pastor of a church; but its modern general signification is in the sense of its being the residence of a parson, and it may be with land or without it. [*St Joseph's*, 189 Mich at 413 (citation omitted).]

The reference to the ecclesiastical definition is merely an historical aside; the Court was obligated to apply the same statutorily-mandated rule of construction which exists to the present day, encompassing the common understanding of a word.[9] It is the "modern general signification"

---

[8] The 1911 version of the act was the same as the original 1893 version, except for the deletion of a single comma which did not affect the meaning. See n 3 of this opinion. The 1911 version thus was a reenactment of the 1893 version, and so for all practical purposes it was the original 1893 version which our Supreme Court construed in *St. Joseph's*.

[9] See 1893 CL, § 50, subsec l, which provided:

> All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

which constitutes a word's "common and approved understanding," not its ecclesiastical definition. In *St Joseph's*, our Supreme Court ruled that the house was not a parsonage, because the minister did not yet live in it. *Id*. at 413-415. The Court held that under the statute, a "parsonage must first be occupied as a parsonage, before it can be held to be exempt from taxation. In other words, it is an essential requirement of the statute that the parsonage must be occupied as such before it can be legally exempted from taxation." *Id*. at 413. Once the property was occupied, the City, "finding that a parsonage had been built, and was at that time occupied, exempted the property from further taxation." *Id*. at 411.

Thus, the common understanding, or "general signification" of the meaning of "parsonage" was simply "the residence of a parson," whether "with or without land." *Id*. at 413. For the same reason, that aspect of the definition was not obiter dicta, as petitioner argues, because it was the controlling, common definition when enacted and was relied on by the legislature.

In applying the commonly understood meaning of "parsonage," *St Joseph's* did not hold or even advert that the resident of a parsonage must minister to a particular congregation, although it was clear in that case that "the rector" did so. *St Joseph's*, 189 Mich at 411. We are of course bound by *St Joseph's*, but its scope is not clear. One could read *St Joseph's* as foreclosing an argument that a pastor must minister to a particular congregation for a church-supplied residence in which the minister resides to constitute a parsonage, as it defined a parsonage simply as the residence of a pastor; or one could view *St Joseph's* as holding that because the case did not present that issue, the Court simply did not address it and it remains an open question today. In conducting its analysis, *St Joseph's* did not use a dictionary to determine the "common or approved understanding" of "parsonage," nor was it required to do so. See *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 622 n 62; 886 NW2d 135 (2016) ("A lay dictionary may be consulted to define a common word or phrase that lacks a unique legal meaning."). Nevertheless, *St Joseph's* did cite a legal encyclopedia. It seems that *St Joseph's* implicitly relied on 1893 as the controlling date, as its statement of the "modern general signification" came directly from the 1891 case it cited, *Wells' Estate v Congregational Church at Underhill Flats*, 63 Vt 116; 21 A 270 (1891); see *St Joseph's*, 189 Mich at 413. And in any event, an 1893 dictionary would have given the same definition. See *Sebring v City of Berkley*, 247 Mich App 666, 678-679; 637 NW2d 552 (2001) ("Because the meaning of a word or the primary accepted definition can change over time, courts often look to dictionary definitions in use at the time a statute was enacted."); see also *Cain v Waste Mgt, Inc (After Remand)*, 472 Mich 236, 247; 697 NW2d 130, 135 (2005) (Statute was

See also current MCL 8.3a. The current version MCL 8.3 to 8.3w was unchanged from its enactment in 1846 until 1959. See Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846, § 1; Compiled Laws of the State of Michigan 1915, § 3(1). In 1959, without changing any of the text, the various subsections were changed from numbered paragraphs in MCL 8.3 to the various lettered subsections in the current version, "to stand as sections 3a to 3w." See 1959 PA 189. That change was merely of the form of numbering. Thus, we are obliged to apply the same rules of construction as our Supreme Court applied in 1915. See current MCL 8.3(u) ("The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments.").

amended many times over nearly 100 year history, without changing the word "loss"; "Because the statute itself does not define 'loss,' " the Court "must ascertain the original meaning the word 'loss' had when the statute was enacted in 1912."). As of 1893, the dictionary definition of "parsonage" was the same as that used by *St Joseph's* for the "modern general signification," viz., "the house and glebe belonging to a parish or ecclesiastical society, and appropriated for the use of the minister of a church." *A Dictionary of the English Language* (1893). The 1915 dictionary definition, the year *St Joseph's* was decided, was no different. See *The Student's Practical Dictionary* (1915) (defining "parsonage" as "The house of the minister of a parish"). Furthermore, in 1893 and 1915 "parson" was defined as "[a] clergyman." *A Dictionary of the English Language* (1893); *The Student's Practical Dictionary* (1915).

Thus, under *St Joseph's*, the resident of a parsonage is not required to minister to a particular parish. See *St Joseph's*, 189 Mich at 413. Rather, a parsonage is merely the residence of a parson. See *id*.[10]

## b. MICHIGAN COURT OF APPEALS CASES

We now turn to the more recent cases. In *Saint Matthew v Delhi Twp*, this Court considered whether properties lived in by church employees, who were a school instructor and a youth minister, qualified as parsonages. *Saint Matthew*, 76 Mich App at 598-599. The *Saint Matthew* Court quoted the *St Joseph's* Court's definition of parsonage and held that "the [parsonage] exemption applies to any church owned house occupied by a minister ordained in that church." *Id*. at 599. Referring to the school instructor and youth minister, because "[n]either is ordained and they are referred to as lay ministers," *id*. at 598, the Court held that the exemption did not apply; rather, the school instructor and youth minister were simply "church employees," *id*., with

---

[10] In addition, an alternative dictionary definition of "parish" in 1893 was "The precinct or territorial jurisdiction of a secular priest or ecclesiastical society, or the precinct, the inhabitants of which belong to the same church; Any religious or ecclesiastical society"; "ecclesiastical" was defined as "Pertaining to the church or it organization or government"; and "church" was defined as "A building set apart for Christian worship; A formally organized body of Christian believers worshipping together; A body of Christian believers, observing the same rights and acknowledging the same ecclesiastical authority; the collective body of Christians; Ecclesiastical influence." *A Dictionary of the English Language* (1893).

Based on these definitions, over the last approximately 130 years, the common understanding of "parsonage" plainly has not required that a pastor minister to one particular congregation. Rather, "parsonage" merely referred to a property belonging to a religious society and housing a minister of a church. That definition has not changed to the present; in 1980, when the present statute was amended, *The Random House College Dictionary* (1980) defined "parsonage" as "the residence of a parson or clergyman, as provided by the parish or church" and defining "church" as "organized religion as a political or social factor" and as "a Christian denomination." We provide the 1915 and 1980 definitions only out of historical interest; the 1893 common understanding of parsonage is controlling. See n 3 of this opinion.

no ministerial function. A dissent would have found that the lay ministers were ministers; the dissenting judge stated that the residences were "occupied by 'ministers of the gospel,' " and that "I find no requirement that the ministers be formally ordained." *Id*. at 600 (WALSH, J., dissenting). Thus, *St Matthew* is clear that, as a legal matter, ordination is the key to whether or not an individual qualifies as a minister; however, the opinion does not shed much light on how the Court determined that fact, and the resolution of that factual question divided the Court.

Finally, in *St John's v Bay City*, 114 Mich App at 617, the principal case relied on by respondent, this Court addressed the question of whether the church-owned residence of a "teaching minister," who was the superintendent of the church-run school, qualified as a parsonage. The Court, relying on the tenets of the Wisconsin Evangelical Lutheran Synod, which was the religious society of which the petitioner was part, drew a distinction between a "teaching minister" and a "preaching minister" who carried out the more traditional pulpit minister functions. *Id*. at 619, 621. In contrasting teaching ministers and preaching ministers, the Court noted that "[t]he Church views them equally as ministers of the gospel," *id*. at 619; and that among other qualifications and duties, the teaching ministers received theological training and were theologically equipped to perform marriages. *Id*. at 621-622. *St John's* then quoted the definitions of "parsonage" from *St Joseph's* and *Saint Matthew* before turning to a contemporary dictionary, concluding that "the parsonage exemption applies to a residence of the pastor or his assistants who are ordained teaching ministers for a particular congregation," *id*. at 624-625, then adding that it "agrees with the definition in *St Matthew*." *Id*. at 625. It is that language regarding "for a particular congregation" on which respondent relies for its argument that the residence is not exempt.

The holdings of *St Joseph's*, *St Matthew*, and *St John's* are consistent and straightforward: a parsonage is the home of a minister, and a minster is someone who is "ordained in that church," *St. Matthew*, 76 Mich App at 599, or, to use the statutory language, ordained in a "religious society," MCL 211.7s. Ordination thus is defined by the doctrine or rules of the particular religious society at issue. For example, in regards to teaching ministers, if the religious society "views them equally as ministers of the gospel," *St John's*, 114 Mich App at 619, then they are ministers for purposes of the exemption. See *id*. at 621 (determining ordination by reference to "Church Canon and Rules of Theology of the Lutheran Church," which are "mandated from the headquarters of the church and is not a matter of local discretion. Teaching ministers are installed or ordained."). By contrast, when an individual is not ordained, he or she is not a minister and the residence therefore is not a parsonage. *Saint Matthew*, 76 Mich App at 599.

Respondent argues that in passing on the eligibility of the teaching ministers for the tax exemption, *St John's* imposed a requirement that a purported pastor minister to a particular congregation. The origin of the "for a particular congregation" language is unclear; *St John's* did not expressly tie it to any of the various definitions of "parsonage" it cited, although the Court noted that the word parsonage "has a local connotation, associating the clergyman and a particular church or congregation." 114 Mich App at 623. It is difficult to read that sentence as holding that a residence is a parsonage *only if* the minister who lives in it ministers to a particular congregation; it follows immediately after the sentence which reads, "Different dictionaries define a 'parson' as 'any clergyman' or as 'the clergyman of a parish or congregation,' and a 'parsonage' as a clergyman's dwelling, especially a free official residence provided for a parson or pastor or minister by his congregation.' " *Id*. The term "any clergyman" is more expansive than the definition for which respondent argues, as is "a clergyman's dwelling," and neither encompasses

a limitation regarding a particular congregation. And a more reasonable reading of the "for a particular congregation" language, if it was in fact intended as a limitation, refers not to the definition of parsonage but rather to the requirement that the residence be "used as a parsonage," MCL 211.7s. In the context of *St John's*, which involved a local minister of a local church, a residence could only be "used as a parsonage" if it was associated with "a particular congregation," as there is no indication that there was a supervisory church hierarchy, as in the present case. Thus, given the facts of *St John's*, a residence could be a "parsonage" only if it was supplied to a "minister" associated with a particular church or congregation, as there was no other manner factually in which a residence could be "used" as a parsonage. Rev. Dr. Crawford's residence, by contrast, clearly can be "used" as a parsonage, as it is church-owned property, occupied by an ordained minister serving church functions, but whose ministerial duties involve administrative functions for numerous congregations.

Moreover, we note that previous decisions of this Court have gone beyond the strict limitation in the definition which respondent suggests. For example, the definition on which respondent relies defines "parson" as "*the* clergyman of a parish or congregation," *St John's*, 114 Mich App at 623 (emphasis added), which if read strictly would mean that each congregation could have only one parson and thus only one parsonage. Rather than such a strict meaning, however, this Court has read the statute as permitting multiple ministers (or more precisely in the context, multiple rabbis) whose residences all qualified as parsonages. See *Congregation B'Nai Jacob v City of Oak Park*, 102 Mich App 724; 302 NW2d 296 (1981). *St John's* noted the holding in *Congregation B'Nai Jacob*, see 114 Mich App at 624, stating that "the Court put great emphasis on the fact that the rabbis involved therein were each equally responsible for the religious needs of the congregation." *Id*. In other words, *St John's* recognized that the "general signification" of definitions depends to some extent on the context. Thus, "the minister" can refer to multiple clergy when the facts establish that there are multiple clergy living in multiple residences owned by a religious society. Similarly, any general understanding that the term "parsonage" is limited to the residence used by a pastor to a particular congregation must give way when, as in this case, the pastor is part of a hierarchy and ministers to a number of churches.[11] In fact *St John's* acknowledged some definitions of "minister" which seem to anticipate just that situation, noting that "[b]oth parson and pastor connote a minister, or rector, having charge of a local church or parish *or body of churches*." 114 Mich App at 624 (emphasis added, citation omitted). Rev. Dr. Crawford undisputedly has charge of a body of churches.

Finally, we note that it is not at all clear what the "for a particular congregation" language adds to the definition of parsonage. The holding of *St John's* would have been the same had the Court said "Based on the foregoing, the Court holds that the parsonage exemption applies to a

---

[11] It is important to note that in discussing the definitions of "minister" and "parsonage" and their various meanings depending on the context, we are not construing actual statutory language, which must be strictly applied, but rather the general or common understanding of words which the legislature left undefined. The common or general understanding of a word can have more than one definition. See Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (Thomson/West, 2012), p 418 ("Because common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense."

residence of the pastor or his assistants who are ordained teaching ministers for a particular congregation," as it did, *id*. at 624-625; or if it had said "Based on the foregoing, the Court holds that the parsonage exemption applies to a residence of the pastor or his assistants who are ordained teaching ministers[,]" and not added the words "for a particular congregation." Even without the additional words, the statement would have been factually correct and would not have changed the holding that the exemption applied. Indeed, the issue of whether the school superintendent was associated with "a particular congregation," was not an issue at all in *St John's*; rather, the only question was whether he was ordained as a minister.

## 4. APPLICATION TO THIS CASE

What we are left with, then, are the consistent holdings of the three cases, and the plain language of the statute. The core definition of "parsonage" derives from *St Joseph*: a residence owned by a religious society, which is occupied by a minister ordained under the rules of that society. *St John's* and *St Matthew* each turned on the definition of ordination, and fleshed out it is meaning. The "for a particular congregation" language from *St John's* is not part of that case's definition of ordination; *St John's* also noted other definitions, including one which plainly did not encompass the limitation respondent seeks. *St John's* express agreement with *St Matthew's* definition of parsonage, which contains no limitation regarding a particular congregation, makes it quite apparent that *St John's* did not impose such a limitation. Moreover, the statute refers to a "religious society," which is broader than the minister of a particular local church or parish; its plain meaning encompasses a minister who is part of church hierarchy. We find no basis for reading the limitation respondent advocates into the statute. The statute, however, does impose the additional requirement that a residence be "used as a parsonage" to qualify for the exemption. MCL 211.7s.

Here, of course, there is no question that Dr. Rev. Crawford is a fully ordained minister in the West Michigan Annual Conference of the United Methodist Church, a religious society. The residence undisputedly is owned by petitioner, a religious society; it is the residence of a parson, Dr. Rev. Crawford; and it is used as a parsonage, because Dr. Rev. Crawford is an actively practicing minister of the religious society. The residence thus fully satisfies the requirements for exemption under the plain language of the tax statute, and no further construction is permitted. See Section III(B)(1).[12] Respondent's attempt to tease a local limitation out of the terms "minister"—or "parson"—and "parsonage," is simply contrary to the common meaning of those words and the statute. We thus have no occasion to consider two rules of construction regarding tax law, that: (1) "[a] property tax exemption is in derogation of the principle that all property shall bear a proportionate share of the tax burden and, consequently, a tax exemption will be strictly construed." *Mich United Conservation Clubs*, 423 Mich at 665; *Retirement Homes of Detroit Annual Conference of United Methodist Church, Inc*, 416 Mich at 348 (same); and (2) that we "generally defer to the Tax Tribunal's interpretation of a statute that it is charged with administering and enforcing." *Twentieth Century Fox Home Entertainment, Inc v Dep't of*

---

[12] The result would be different if, for example, Dr. Rev. Crawford were retired. That is because, if the minister living in a church-owned house is retired, then it is not "used" as a parsonage because its resident no longer has a connection to any church function.

*Treasury*, 270 Mich App 539, 541; 716 NW2d 598 (2006) (quotation marks and citation omitted; alteration in original).

## IV.  CONCLUSION

The MTT correctly applied the definition of "parsonage" based on that word's common understanding, that is, the home of a parson, as well as the remainder of the statutory language of the tax exemption.  The facts of this case are undisputed, and thus our review is limited solely to that legal conclusion; for the reasons stated, the MTT committed no error of law.  Contrary to respondent's argument, the statute has no requirement that in order for a residence to constitute a "parsonage," its resident be a pastor who ministers to a particular congregation.  The statute does require, though, the residence be "used as a parsonage."  In this case, those statutory requirements are met.

The MTT's order granting summary disposition to petitioner is affirmed.  Petitioner, as the prevailing party, may tax costs pursuant to MCR 7.219.

/s/ Jonathan Tukel
/s/ Jane E. Markey